# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ALASKA

GWENDOLYN GRACE LARSEN,

                       Plaintiff,

    vs.

ANDREW SAUL,[1]
Commissioner of Social Security,

                  Defendant.

Case No. 3:18-cv-00221-SLG

## DECISION AND ORDER

On or about May 4, 2015, Gwendolyn Grace Larsen filed an application for Disabled Widow's Insurance Benefits under Title II of the Social Security Act ("the Act")[2] alleging disability beginning October 15, 2010.[3]  Ms. Larsen has exhausted her administrative remedies and filed a Complaint seeking relief from this Court.[4]

Ms. Larsen's opening brief asks the Court to reverse and remand the agency decision.[5]  The Commissioner filed an Answer and a brief in opposition to Ms. Larsen's

---

[1] Andrew Saul is now the Commissioner of Social Security and is automatically substituted as a party pursuant to Fed. R. Civ. P. 25(d).  See also section 205(g) of the Social Security Act, 42 U.S.C. 405(g) (action survives regardless of any change in the person occupying the office of Commissioner of Social Security).

[2] The Court uses the term "disability benefits" to describe Title II Disabled Widow's Insurance Benefits herein.

[3] Administrative Record ("A.R.") 27, 200–02.  The ALJ noted that in a brief dated December 30, 2016, Ms. Larsen amended her alleged disability onset date to October 15, 2010.  A.R. 27, 52; *see also* Docket 13 at 1.

[4] Docket 1 (Larsen's Compl.).

[5] Docket 13 (Larsen's Br.).

opening brief.[6]  Ms. Larsen filed a reply brief.[7]  Oral argument was not requested and was

not necessary to the Court's decision.  This Court has jurisdiction to hear an appeal from

a final decision of the Commissioner of Social Security.[8]  For the reasons set forth below,

Ms. Larsen's request for relief will be denied.

## I.    STANDARD OF REVIEW

A decision by the Commissioner to deny disability benefits will not be overturned

unless it is either not supported by substantial evidence or is based upon legal error.[9]

"Substantial evidence" has been defined by the United States Supreme Court as "such

relevant evidence as a reasonable mind might accept as adequate to support a

conclusion."[10]  Such evidence must be "more than a mere scintilla," but may be "less than

a preponderance."[11]  In reviewing the agency's determination, the Court considers the

evidence in its entirety, weighing both the evidence that supports and that which detracts

from the administrative law judge ("ALJ")'s conclusion.[12]  If the evidence is susceptible to

---

[6] Docket 11 (Answer); Docket 14 (Defendant's Br.).

[7] Docket 15 (Reply).

[8] 42 U.S.C. § 405(g).

[9] *Matney ex rel. Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992) (citing *Gonzalez v. Sullivan*, 914 F.2d 1197, 1200 (9th Cir. 1990)).

[10] *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

[11] *Perales*, 402 U.S. at 401; *Sorenson v. Weinberger*, 514 F.2d 1112, 1119 n.10 (9th Cir. 1975) (per curiam).

[12] *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).

more than one rational interpretation, the ALJ's conclusion must be upheld.[13]  A reviewing court may only consider the reasons provided by the ALJ in the disability determination and "may not affirm the ALJ on a ground upon which she did not rely."[14]  An ALJ's decision will not be reversed if it is based on "harmless error," meaning that the error "is inconsequential to the ultimate nondisability determination . . . or that, despite the legal error, the agency's path may reasonably be discerned, even if the agency explains its decision with less than ideal clarity."[15]  Finally, the ALJ has a "special duty to fully and fairly develop the record and to assure that the claimant's interests are considered."[16]  In particular, the Ninth Circuit has found that the ALJ's duty to develop the record increases when the claimant is unrepresented or is mentally ill and thus unable to protect her own interests.[17]

## II.    DETERMINING DISABILITY

The Act provides for the payment of disability insurance to individuals who have contributed to the Social Security program and who suffer from a physical or mental

---

[13] *Gallant v. Heckler*, 753 F.2d 1450, 1453 (9th Cir. 1984) (citing *Rhinehart v. Finch*, 438 F.2d 920, 921 (9th Cir. 1971)).

[14] *Garrison v. Colvin*, 759 F.3d 995, 1010 (9th Cir. 2014).

[15] *Brown-Hunter v. Colvin,* 806 F.3d 487, 492 (9th Cir. 2015) (internal quotation marks and citations omitted).

[16] *Smolen v. Chater,* 80 F.3d 1273,1288 (9th Cir. 1996) (quoting *Brown v. Heckler,* 713 F.2d 441, 443 (9th Cir. 1983)); *see also Garcia v. Comm'r of Soc. Sec.,* 768 F.3d 925, 930 (9th Cir. 2014).

[17] *Tonapetyan v. Halter,* 242 F.3d 1144, 1150 (9th Cir. 2001).

disability.[18]  In addition, SSI may be available to individuals who are age 65 or older, blind,

or disabled, but who do not have insured status under the Act.[19]  Disability is defined in

the Act as follows:

> [I]nability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.[20]

The Act further provides:

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.[21]

The Commissioner has established a five-step process for determining disability

within the meaning of the Act.[22]  A claimant bears the burden of proof at steps one through

four in order to make a prima facie showing of disability.[23]  If a claimant establishes a

---

[18] 42 U.S.C. § 423(a).

[19] 42 U.S.C. § 1381a.

[20] 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).

[21] 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

[22] 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

[23] *Treichler v. Comm'r Soc. Sec. Admin.*, 775 F.3d 1090, 1096 n.1 (9th Cir. 2014) (quoting *Hoopai v. Astrue*, 499 F.3d 1071, 1074–75 (9th Cir. 2007)); s*ee also Tackett v. Apfel*, 180 F.3d 1094, 1098

prima facie case, the burden of proof then shifts to the agency at step five.[24]   The

Commissioner can meet this burden in two ways: "(a) by the testimony of a vocational

expert, *or* (b) by reference to the Medical-Vocational Guidelines at 20 C.F.R. pt. 404,

subpt. P, app. 2."[25]   The steps, and the ALJ's findings in this case, are as follows:

**Step 1.**   Determine whether the claimant is involved in "substantial gainful activity."

*The ALJ concluded that Ms. Larsen had not engaged in substantial gainful activity since*

*October 15, 2010, the alleged onset date.   ALJ LaCara also noted that Ms. Larsen was*

*"the unmarried widow of the deceased insured worker and had attained the age of 50,"*

*having also previously met the "non-disability requirements for disabled widow's benefits*

*set forth in section 202(e) of the Social Security Act."   ALJ LaCara found the "prescribed*

*period ended on April 30, 2016."[26]*

**Step 2.**   Determine whether the claimant has a medically severe impairment or

combination of impairments.   A severe impairment significantly limits a claimant's physical

or mental ability to do basic work activities and does not consider age, education, or work

experience.   The severe impairment or combination of impairments must satisfy the

twelve-month duration requirement.   *The ALJ determined that Ms. Larsen had the*

*following severe impairments: "very mild to minimal degenerative changes of the right*

*ankle, mild to moderate degenerative changes at the left thumb," "[m]oderate*

---

(9th Cir. 1999).

[24] *Treichler*, 775 F.3d at 1096 n.1; *Tackett*, 180 F.3d at 1098 (emphasis in original).

[25] *Tackett*, 180 F.3d at 1101.

[26] A.R. 29.

*degenerative changes at the great toe," and "apparent chronic fatigue syndrome." The*

*ALJ found that Ms. Larsen's history of glaucoma, small loose body in the right knee,*

*minimal osteoarthritis in the left knee medial compartment, complaints of shoulder pain,*

*and mental impairments of depression, anxiety, personality disorder were all non-severe*

*and did not result in significant vocational limitations.*[27]

**Step 3.**  Determine whether the impairment or combination of impairments meets

or equals the severity of any of the listed impairments found in 20 C.F.R. pt. 404, subpt.

P, app.1 precluding substantial gainful activity.  If the impairment is the equivalent of any

of the listed impairments, and meets the duration requirement, the claimant is

conclusively presumed to be disabled.  If not, the evaluation goes on to the fourth

step.  *The ALJ determined that Ms. Larsen did not have an impairment or combination of*

*impairments that met or medically equaled the severity of a listed impairment.*[28]

Before proceeding to step four, a claimant's residual functional capacity ("RFC") is

assessed.  Once determined, the RFC is used at both step four and step five.  An RFC

assessment is a determination of what a claimant is able to do on a sustained basis

despite the limitations from her impairments, including impairments that are not severe.[29]

*The ALJ concluded that Ms. Larsen had the RFC to perform light work except she was*

*limited to lifting and carrying 20 pounds occasionally and 10 pounds frequently; sitting,*

---

[27] A.R. 30–31.

[28] A.R. 33.

[29] 20 C.F.R. § 404.1520(a)(4).

*standing, and/or walking for six hours each total in an eight-hour workday; occasionally handling with the left upper extremity; frequently fingering with the bilateral upper extremities; and never climbing ladders, ropes, or scaffolds.*[30]

**Step 4.**  Determine whether the claimant is capable of performing past relevant work.  At this point, the analysis considers whether past relevant work requires the performance of work-related activities that are precluded by the claimant's RFC.  If the claimant can still do her past relevant work, the claimant is deemed not to be disabled.  Otherwise, the evaluation process moves to the fifth and final step.  *The ALJ found that Ms. Larsen was capable of performing past relevant work as a curriculum advisor.*[31]

**Step 5.**  Determine whether the claimant is able to perform other work in the national economy in view of her age, education, and work experience, and in light of the RFC.  If so, the claimant is not disabled.  If not, the claimant is considered disabled.  *The ALJ determined that although Ms. Larsen was capable of past relevant work, there were also other jobs that existed in significant numbers in the national economy that Ms. Larsen could perform, including appointment clerk and civil service clerk.*[32]

The ALJ concluded that Ms. Larsen was not disabled at any time from October 15, 2010 through May 2, 2017, the date of the decision.[33]

---

[30] A.R. 33.

[31] A.R. 36.  The VE testified this job was a sedentary position.  A.R. 76.

[32] A.R. 37–38.

[33] A.R. 38.

### III.    PROCEDURAL AND FACTUAL BACKGROUND

Ms. Larsen was born in 1956; she is 63 years old.[34]  She reported working as an admissions advisor for the University of Alaska, Anchorage ("UAA"), from approximately 1997 to 2010 and an admission "specialist" for UAA prior to 1997.[35]  On October 29, 2015, the Social Security Administration ("SSA") determined that Ms. Larsen was not disabled under the applicable rules.[36]  On December 28, 2015, Ms. Larsen timely requested a hearing before an ALJ.[37]  On January 13, 2017, Ms. Larsen appeared and testified with representation at a hearing held before ALJ Cecilia LaCara.[38]  On May 2, 2017, the ALJ issued an unfavorable ruling.[39]  On February 22, 2018, the Appeals Council denied Ms. Larsen's request for review.[40]  Ms. Larsen timely appealed to this Court on September 26, 2018.[41]

---

[34] A.R. 201.

[35] A.R. 70, 246, 274.

[36] A.R. 27, 83.

[37] A.R. 27, 101.

[38] A.R. 58–71.

[39] A.R. 24–38.

[40] A.R. 1–6.

[41] Docket 1.  The Appeals Council had granted an extension of time to file the appeal.  A.R. 8.

*Medical Records*

Although Ms. Larsen's medical records date back to 2007, the Court focuses on the relevant medical records after the amended alleged disability onset date of October 15, 2010:

On November 12, 2010, Ms. Larsen had x-rays taken of her ankles. The right ankle x-ray showed "very mild degenerative changes in the anterior tibiotalar joint" and "minimal degenerative changes" at the inferior aspect of the medial gutter. The left ankle x-ray showed that "[m]inimal degenerative changes may be present along the medial corner of the talar dome." However, there was "no evidence of acute fracture or dislocation of either ankle."[42]

On November 18, 2010, Ms. Larsen followed up with Mark Swircenski, PAC, at Alaska Family Wellness Center. She reported having insomnia for 10 years, but at the time of the visit, she was able to get about six hours of sleep a night. She also reported that her husband had died in October; however, she denied any depression.[43]

On December 3, 2010, Ms. Larsen visited PAC Swircenski at the Alaska Family Wellness Center. She reported improved sleep after stopping her 3:00 p.m. dose of caffeine. On physical examination, Ms. Larsen was "in no acute distress."[44]

---

[42] A.R. 361.

[43] A.R. 404.

[44] A.R. 405.

On December 14, 2010, Ms. Larsen saw PAC Swircenski. She reported insomnia with "emotional stressors with the recent death of her husband and some [issues resolving] the stepchildren and probate of the will." She was in no acute distress upon physical examination.[45]

On January 13, 2011, Ms. Larsen saw PAC Swircenski for follow up regarding insomnia. She reported that she was under increased stress with the recent death of her husband. She was prescribed Ambien.[46]

On February 17, 2011, Ms. Larsen initiated care with Ginger Scoggin, DNP, at Manuka Health Clinic in Anchorage, Alaska. She reported a history of anxiety and significant trauma with the death of her husband and taking care of her mother. She also reported feeling anemic, cold, and "run down." Ms. Larsen reported that she had been on Ativan "for a few years and then went off it for 2 years," but had started it again in October 2010 and "it seem[ed] to be helping." On physical examination, Ms. Larsen was "[n]ormotensive, in no acute distress." DNP Scoggin diagnosed Ms. Larsen with transient disorder of initiating or maintaining sleep; generalized anxiety disorder; iron deficiency anemia, unspecified; and unspecified vitamin D deficiency. DNP Scoggin refilled Ms. Larsen's Ativan prescription and prescribed Lunesta at the visit.[47]

---

[45] A.R. 406. Ms. Larsen followed up with PA Swircenski regarding insomnia and stress on December 27, 2010, January 13, 17, 31, 2011, and February 14, 2011. A.R. 407–11.

[46] A.R. 408. On January 17, 2011, Ms. Larsen called regarding her Ambien prescription. She indicated that she was getting 5-6 hours of sleep with Ambien and woke up early. Her prescriptions included Lorazapam and Ambien. Lorazapam is used to treat anxiety. *See* https://www.webmd.com/drugs/2/drug-8892-5244/lorazepam-oral/lorazepam-oral/details.

[47] A.R. 511. Ms. Larsen followed up with DNP Scoggin on December 13, 2011 and June 13, 2012. A.R. 513–14. DNP Scoggin prescribed Valium at the June 2012 visit, but noted "that is not the

On September 6, 2012, Ms. Larsen had x-rays of both knees. The right knee x-ray showed "[a] small loose intraarticular body" that was "questioned in the intercondylar notch." The left knee x-ray showed "[m]inimal osteoarthritis in the medial knee compartment," but "[n]o acute osseous findings."[48]

On September 17, 2012, Ms. Larsen established care with Maggie Laurenberg, PAC, at Willow Medical & Wellness. She reported insomnia, menopausal symptoms, and right knee pain while running on the treadmill. She also reported that "she is seeking a new relationship and will be traveling to see him in Minnesota." On physical examination, PAC Laurenberg observed that Ms. Larsen was a "[h]ealthy appearing female in no acute distress."[49]

On October 24, 2012, Ms. Larsen presented to the emergency room after being referred by the Providence crisis line for grief and depression. She reported grief and pain associated with her husband's death and the sale of the home she had lived in with her husband. She reported chronic insomnia that had worsened in the past week. Ms. Larsen was assessed as being at low imminent risk for suicide and low imminent risk for violence. She was assessed with bereavement and adjustment disorder, but it was determined she could be safely discharged.[50]

---

answer" long term and "without proper nutrition first, she will continue to struggle." A.R. 514.

[48] A.R. 363–64.

[49] A.R. 412–13, 524.

[50] A.R. 325–31, 515–20.

On October 31, 2012, Ms. Larsen saw Masao Yanagida, M.D., at Willow Medical & Wellness. She reported that she had had a "breakdown" recently and went to the emergency department at Providence. Ms. Larsen reported that she had continuing problems with insomnia. Dr. Yanagida diagnosed Ms. Larsen with depression and anxiety. She also noted Ms. Larsen had glaucoma. She assigned Ms. Larsen a GAF of 50. Dr. Yanagida's overall prognosis was "good" and she noted that Ms. Larsen's level of insight, baseline functioning, and support systems were good and her motivation to engage in treatment was excellent.[51]

On November 12, 2012, Ms. Larsen followed up with Michael Fischer, M.D., at Alaska Family Wellness Center. She reported sensitivity to the cold, low weight, chronic stress, and had questions about treatment for degenerative joint disease. On physical examination she was "in no acute distress." She was assessed with fatigue and malaise, anxiety disorder, and osteoarthritis.[52]

On November 26, 2012, Ms. Larsen followed up with Dr. Fischer. At the exam, Dr. Fischer noted she was alert and oriented, friendly and cooperative, and had a "much more animated appearance," but Ms. Larsen reported using melatonin "all the time and feels groggy along with distressed."[53]

---

[51] A.R. 292–98.

[52] A.R. 420.

[53] A.R. 422.

On November 29, 2012, Ms. Larsen followed up with Dr. Yanagida. She reported stress, insomnia, and knee pain. Dr. Yanagida assessed her anxiety and depression as stable.[54]

On December 19, 2012, Ms. Larsen had an x-ray of her right foot. The x-ray showed "moderate nonuniform narrowing with osteophyte formation and subchondral cyst formation at the metatarsal phalangeal joint of the great toe" with no fracture and a small plantar calcaneal spur.[55]

On January 2, 2013, Ms. Larsen saw Dr. Yanagida. She reported worsening insomnia. Ms. Larsen also reported that her sleep was better before she developed glaucoma in 2000. Dr. Yanagida observed that Ms. Larsen's concentration, energy, and appetite were normal; her behavior was within normal limits with good eye contact; her thought process was linear and logical; she was alert and oriented; and her cognition was grossly intact.[56]

On January 4, 2013, Ms. Larsen followed up with Dr. Fischer. She reported doing yoga regularly and exercising every day. Dr. Fischer observed that Ms. Larsen was "visibly more animated, active and smiling." He also noted that her knee x-rays were "negative for degenerative joint disease, has loose body in the intercondylar space of the right knee."[57]

---

[54] A.R. 291.

[55] A.R. 368.

[56] A.R. 290.

[57] A.R. 426.

On January 14, 2013, Ms. Larsen initiated physical therapy at Advanced Physical Therapy. She reported pain and stiffness in her left and right lower extremities. Zuzana Rogers, PT, COMT, assessed Ms. Larsen with impairments "with endurance, joint mobility, poor body mechanics and range of motion." PT Rogers opined that "[t]hese conditions warrant therapeutic intervention for the application of selective exercise and specific mobilization to restore neuromuscular control and functional mobility." PT Rogers recommended physical therapy twice a week for eight weeks.[58]

On February 26, 2013, Ms. Larsen saw Dr. Yanagida. She reported worsening trembling in her legs, but improved sleep. Dr. Yanagida assessed Ms. Larsen with depression, anxiety, and PTSD.[59]

On March 11, 2013, Ms. Larsen saw Clara Scott, PAC. She reported insomnia problems; that she napped on occasion from 30 minutes to two hours in the afternoons; exercised one hour and 20 minutes four times per week on the treadmill, elliptical, and bike; had several social circles; and went out with friends frequently. On physical examination, PAC Scott observed that Ms. Larsen was alert and cooperative and in no acute distress.[60] On the same date, Ms. Larsen visited Dr. Yanagida. She reported increased anxiety and concern about her insomnia, but she denied worsening depression.

---

[58] A.R. 568–70. Ms. Larsen attended an additional physical therapy session on February 14, 2013. A.R. 535–36.

[59] A.R. 289.

[60] A.R. 429–30.

She reported that her eye medications may be causing the insomnia. Dr. Yanagida made no changes in Ms. Larsen's medications.[61]

On April 24, 2013, Ms. Larsen saw PAC Scott. She reported that her glaucoma medication had been causing her insomnia for the past 13 years and that she had stopped taking her glaucoma medication drops and insomnia medications. She reported walking and socializing daily at yoga or having lunch with friends. She reported that she would be traveling to Houston in May and that "everyone [was] telling her she [was] depressed." On physical examination, PAC Scott observed that Ms. Larsen was not in acute distress. PAC Scott recommended cognitive behavioral therapy instead of medications for Ms. Larsen's insomnia.[62]

On April 26, 2013, Ms. Larsen saw Dr. Yanagida. She reported insomnia, but she denied depression and anxiety. Dr. Yanagida "encouraged [Ms. Larsen] to live [with] insomnia" and recommended diet and exercise.[63]

On September 11, 2013, Ms. Larsen initiated care with Beth Baker, M.D., at Providence Alaska Medical Center. She reported having insomnia. She queried if she might be a candidate for social security disability because of her insomnia. Dr. Baker recommended adjustments in Ms. Larsen's sleeping schedule. Dr. Baker "informed [Ms.

---

[61] A.R. 288.

[62] A.R. 432–33.

[63] A.R. 287.

Larsen] I did not think that she [was] disabled from insomnia and that I [did] not think she warranted Social Security disability for this."[64]

On December 11, 2013, Ms. Larsen visited Dr. Fischer. She reported that she was "feeling much stronger" and had done "some extended travel to the lower 48." She reported stopping all her medications. On physical examination, Dr. Fischer observed "positive focal tenderness over dorsal wrist at lunate." He also noted Ms. Larsen was alert and oriented; friendly and cooperative.[65] On the same date, Ms. Larsen had an x-ray of her left hand. The x-ray showed "[d]egenerative changes . . . at the radioscaphoid joint and at the first carpometacarpal joint," but that "[o]therwise, the remainder of the left hand appears to be within normal limits."[66]

On January 3, 2014, Ms. Larsen saw Dr. Fischer for prolotherapy for her left hand and wrist. Ms. Larsen reported insomnia. Dr. Fischer diagnosed Ms. Larsen with degenerative joint disease, insomnia, and menopause.[67]

On February 6, 2014, Ms. Larsen followed up with Dr. Fischer. She reported improvement in her joints, but still had "some residual discomfort involving her left thumb." She reported her wrist was entirely pain-free at the time. She did not report any sleep problems at that visit. On physical examination, Dr. Fischer observed positive tenderness in the CMC joint of the left thumb, but that the "dorsal CMC joint and region along [the]

---

[64] A.R. 749–52.

[65] A.R. 439.

[66] A.R. 369.

[67] A.R. 442.

posterior hand previously injected all appear to be nontender to palpation [with an] active range of motion."[68]

On February 10, 2014, Ms. Larsen followed up with PAC Scott. She reported doing yoga two to three times per week and aerobic exercise on the treadmill, elliptical, or walking outside four to five times per week. She reported that she was "just now getting back on track with the sleep." She reported starting a new romantic relationship. On physical examination, PAC Scott observed that Ms. Larsen was well nourished, well developed, alert and cooperative, well groomed, and appeared in no acute distress.[69]

On February 25, 2014, Ms. Larsen saw Dr. Fischer for prolotherapy in her hand. She also reported improved sleep, but "some anxiety in the afternoon."[70]

On July 7, 2014, Ms. Larsen saw Bethany Buchanan, DNP, at Avante Medical Center. She reported "not sleeping well." She denied depression, bipolar disorder, and anxiety. DNP Buchanan noted that Ms. Larsen "seemed a little out of it," but that her physical exam was normal. DNP Buchanan prescribed thyroid medication.[71]

On July 22, 2014, Ms. Larsen followed up with DNP Buchanan. She reported that "overall she is better" and that she had decided to go back to work, but she hoped "not too soon." She reported that her sleep had improved "tremendously" and she felt

---

[68] A.R. 455.

[69] A.R. 459–60.

[70] A.R. 466.

[71] A.R. 717–20. Ms. Larsen followed up regularly at Avante Medical Center from October 3, 2014 through June 26, 2015. A.R. 634–95. On February 23 and March 12, 2015, Christine Sagan, NP, noted "difficulty with memory, retention." A.R. 673, 677.

"comfortable in taking a job." On physical examination, DNP Buchanan observed that Ms. Larsen was "well overall" and alert and oriented to person, place, and time. Ms. Larsen denied feeling sad or worried.[72]

On September 9, 2014, Ms. Larsen saw DNP Buchanan. She reported that her sleep had improved, but that she still occasionally had nights that she didn't sleep well. She also reported walking five miles and "felt bad afterwards" as she was tired, stiff, and sore. On examination, DNP Buchanan observed that Ms. Larsen looked well and was alert and oriented, but "sound[ed] depressed."[73]

On February 5, 2015, Ms. Larsen initiated counseling with Doris Bergeron, LCSW, seeking to address sleep issues. On examination, LCSW Bergeron observed that Ms. Larsen was casual and neat in appearance; had a cooperative attitude; normal speech; a stable appetite and weight; was distracted and did not have a good memory; had normal perception; logical and coherent thought processes; and fair insight and judgment.[74]

On February 23, 2015, Ms. Larsen saw Christine Sagan, NP, at Avante Medical Center. She reported that she had been having night sweats and that she had started

---

[72] A.R. 723–24.

[73] A.R. 725–32. Ms. Larsen followed up regularly at Avante Medical Center from October 3, 2014 through June 26, 2015. A.R. 634–95. On February 23 and March 12, 2015, Christine Sagan, NP, noted "difficulty with memory, retention." A.R. 673, 677.

[74] A.R. 753–58. Ms. Larsen attended counseling sessions with LCSW Bergeron every two weeks regularly from February 2015 until approximately November 28, 2016. A.R. 759–825. Many of the entries report sleeping difficulties, but on March 12, 2015, Ms. Larsen reported sleeping consistently 5-6 hours and that she had had 8 hours of the sleep the night before and "felt like her old self." A.R. 672. However, on May 10, 2016, Ms. Larsen reported having "a 'relapse' with her chronic fatigue syndrome." A.R. 778.

testosterone. Ms. Larsen stated, "this changed things negatively." She reported sleeping 4-7 hours at night and that she was able to sleep slightly better "when she eats a large meal at night." NP Sagan noted that Ms. Larsen "has had years of malaise, stress, insomnia and fatigue" and "[t]his has prevented her from work."[75]

On June 15, 2015, Ms. Larsen visited NP Sagan. She reported fatigue. NP Sagan assessed Ms. Larsen with menopause, insomnia, fatigue, constipation, irritable bowel syndrome, shoulder pain, pain in lower limb, food allergy, low back pain, neck pain, hypothyroidism, depressive disorder, and shoulder joint pain. NP Sagan opined that Ms. Larsen was "stable," noting "[h]er fatigue is present but she has made progress."[76]

On June 26, 2015, Ms. Larsen saw DNP Buchanan for shoulder pain and low back pain. She reported switching her activities and getting better sleep. DNP Buchanan assessed Ms. Larsen with osteoarthritis, degenerative joint disease of the hand, fatigue, menopause, insomnia, and constipation.[77]

On October 13, 2015, Ms. Larsen saw William Campbell, M.D., for a psychiatric disability evaluation. She reported that in 2010 her fatigue and cognitive defects cause her work performance to decline. She reported retiring from University of Alaska in 2010 and that "part of the reason that she retired was that she wanted to be able to visit with [her two children in Texas] more often." She reported some dating, having long-term

---

[75] A.R. 676–79.

[76] A.R. 642–43.

[77] A.R. 634–39.

friends, taking belly dancing lessons, going to yoga classes three times a week, and walking a mile or two every day for exercise. Dr. Campbell observed that Ms. Larsen was "[s]tylishly groomed and dressed"; was on time and friendly; had normal speech, thought content, memory, and fund of knowledge; was alert and oriented; could calculate fairly; and had good spelling. Dr. Campbell noted that Ms. Larsen did poorly with serial 7's. He also noted that her insight and judgment were fair. He diagnosed Ms. Larsen with cognitive disorder, not otherwise specified; dependent personality disorder; glaucoma; myalgias and arthralgias; and a GAF score of 70. Dr. Campbell noted that Ms. Larsen complained of cognitive defects and "[o]n examination, she had to be coaxed to give maximum effort." He opined that Ms. Larsen would be competent to manage her own benefits and that her prognosis was good. Dr. Campbell noted that Ms. Larsen found psychotherapy "to be quite helpful in examining her dependency needs and in grieving her late husband."[78]

On October 21, 2015, Ms. Larsen saw Ernest Meinhardt, M.D., at Independence Park Medical Services, for a physical examination. She reported that her insomnia onset in 2000, but that "since establishing with her new Avante Clinic her insomnia has pretty much resolved and is under control" and she "feels rested." She reported that she had anxiety, but she denied needing medications. Ms. Larsen also denied that anxiety interfered with her activities of daily living. She reported discontinuing ocular drops for glaucoma and that her eye pressure remained stable. Ms. Larsen reported bilateral

---

[78] A.R. 735–38.

shoulder pain, but that following up with a chiropractor and having massage therapy "has pretty much alleviated her symptoms" and that the pain did not "interfere with her daily activities." Ms. Larsen also reported left wrist pain and had decreased range of motion, but adequate grip strength. Dr. Meinhardt noted that Ms. Larsen "apparently has chronic fatigue syndrome."[79] On the same date, Ms. Larsen had an x-ray of her left wrist. The x-ray showed "[s]evere degenerative change in radiocarpal compartment, joint space narrowing, and intense sclerosis" and "[m]ild degenerative change first carpal-metacarpal articulation."[80]

On October 29, 2015, Myung Song, D.O., a state medical consultant, reviewed Ms. Larsen's medical records. Based on that review, Dr. Song opined that Ms. Larsen could perform light duty work and was capable of returning to her prior job as an admission counselor, with additional manipulation limitations based on her left wrist impairment."[81] On the same date, state medical consultant, Michael Dennis, Ph.D., opined that Ms. Larsen's mental disorders were non-severe. Dr. Dennis opined that Ms. Larsen had a mild restriction of her activities of daily living; mild difficulties in maintaining social functioning; and mild difficulties maintaining concentration, persistence, or pace.[82]

The medical records for 2016 consist only of treatment records from LSCW Bergeron.

---

[79] A.R. 745–48.

[80] A.R. 742.

[81] A.R. 94. Ms. Larsen reported that she was right-handed in her function report. A.R. 255.

[82] A.R. 89–94.

On January 13, 2017, Allison Kelliher, M.D., at Vitae Integrative Medical Center, wrote a letter indicating that she had been Ms. Larsen's primary care provided since September 2016. Dr. Kelliher noted that Ms. Larsen saw her regularly for "[m]ajor depression, generalized anxiety, chronic pain syndrome, fibromyalgia, chronic low back pain, osteoarthritis, menopausal syndrome, impaired cognition, memory impairment, and insomnia. Dr. Kelliher opined that Ms. Larsen's "extreme fatigue, impaired concentration and polyarthralgias limit her ability to work" and that Ms. Larsen "currently finds it very challenging to meet the demands of her daily life." Dr. Kelliher also noted that Ms. Larsen was "quite motivated however to get well despite her limitations and participates in activities such as meditation and yoga and therapy."[83]

The following medical records were submitted to the Appeals Council after ALJ LaCara's May 2, 2017 decision:

On June 20, 2017, Ms. Larsen had MRIs of her thoracic and cervical spine. The MRIs showed a small disc protrusion at T6-7 and T7-8 resulting in no stenosis and early disc degeneration in the mid-cervical spine with "[u]ncovertebral spurring contributing to neuroforaminal stenoses at a few levels, most pronounced (moderate in severity) at C5–6 on the left."[84]

On October 2, 2017, LCSW Bergeron wrote a letter summarizing Ms. Larsen's treatment with her. LCSW Bergeron noted that Ms. Larsen had been in psychotherapy

---

[83] A.R. 828. The letter is dated January 13, 2016, but the year appears to be a typographical error. No treatment records from Dr. Kelliher are in the record.

[84] A.R. 17–18, 20.

since February 5, 2015, with breaks from November 9, 2015 to March 2, 2016 and April 18, 2017 until September 12, 2017. She also noted that initially Ms. Larsen reported sleep issues, difficulty with concentration and memory, and feeling overwhelmed with daily tasks. Only the first page of LCSW Bergeron's summarization letter is included in the Court's record.[85]

On October 3, 2017, Dr. Kelliher wrote a letter on Ms. Larsen's behalf. Dr. Kelliher noted that Ms. Larsen originally "carried the diagnosis of fibromyalgia with depression and PTSD." She also stated that "after conservative treatment, we initiated a work up for her chronic neck and back pain by obtaining [an] MRI." Dr. Kelliher described Ms. Larsen's MRI results from June 2017, noting that "her cervical imaging is notable for facet arthropathy, and DDD with moderate foraminal stenosis resulting in cervical radiculopathy" and mid-thoracic degenerative disc disease at T6-8 "which generates a tremendous amount of pain for her despite efforts in PT, massage therapy and maximal medication management." Dr. Kelliher indicated that "[Ms. Larsen] finds these pains quite debilitating and they certainly interrupt her quality of life and activities of daily living" and that Ms. Larsen's "picture [was] somewhat complicated by her history of depression, this may also be exacerbated by her pain."[86]

---

[85] A.R. 23.

[86] A.R. 22.

*Hearing Testimony on January 13, 2017*

Ms. Larsen attended a hearing before ALJ LaCara on January 13, 2017 with an attorney representative. She testified that she worked as an enrollment advisor from 1997 to 2010 and before that time, she had worked as an admission specialist. She reported that she retired from UAA in approximately 2009. Ms. Larsen also testified that she travelled once a year to meet with family in Houston, Texas, but denied traveling to meet a romantic interest out of state.[87] She testified that after waking up each morning, she warmed up a microwave dinner and then laid back down. She indicated that she spent her day resting, going to a yoga class, doing housework, listening to music, watching television, working on her iPad, and reading. She testified that she could make her bed every day, do laundry, spend time on the computer, and grocery shop, but she had a housekeeper clean the house once a month. She testified that she would wake up two to three times during the night. Ms. Larsen reported that she had a driver's license and could drive. She also reported that she could manage buttons and zippers; walk with friends at a slow pace one time per week for two to three miles; and stand in her kitchen for an hour to an hour and a half. She testified that she would have difficulty sitting at a clerical job. She also testified that she could add, subtract, and make change.[88]

Margaret Moore, Ph.D., testified as the psychological expert at the hearing, based on her review of the records. She testified that Ms. Larsen did not meet or equal the new

---

[87] In a treatment note from September 2012, Ms. Larsen discussed "seeking a new relationship" and that she was "traveling to see him in Minnesota." A.R. 416.

[88] A.R. 58–71.

mental health listings.[89]   She opined that Ms. Larsen's mental impairments were non-severe or "mild."  She stated, "I would note that just from my point of view, a clinical point of view, this woman seems to be quite actively engaged in the world, functioning really quite well."  Dr. Moore noted that although there were "periods of time in this broad time span where she did have depression . . . much of that . . . was situationally driven."  Dr. Moore noted that Ms. Larsen was dating frequently, going out with friends, traveling, and was capable of handling "very complex things, such as the sale of the home and moving." Dr. Moore also discussed Ms. Larsen's chronic insomnia, stating, "some time in 2013, her doctors discovered that her medications that she was taking for glaucoma, a physical condition . . . were causing her insomnia.  And once you removed and stopped taking those meds, her sleep issues resolve."  Dr. Moore concluded that Ms. Larsen's sleep problem was not attributable to depression or anxiety, but a medication side effect.[90]

---

[89] Dr. Moore's testimony at the January 2017 hearing was based on the new mental health listings, effective January 17, 2017.  A.R. 54.  The new "B" criteria assess an individual's ability to: 1) understand, remember, or apply information; 2) interact with others; 3) concentrate, persist, or maintain pace; and 4) adapt or manage oneself.  20 C.F.R. Pt. 404, Subpt.P, App.1.

The Social Security Administration's Revised Medical Criteria for Evaluating Mental Disorders states that the new mental health listings are applied to "new applications filed on or after the effective date of the rules, and to claims that are pending on or after the effective date."  In a footnote, the SSA clarified that this means the SSA will use the final rules "on and after their effective date, in any case in which we make a determination or decision.  We expect that federal courts will review our final decisions using the rules that were in effect at the time we issued the decisions.  If a court reverses our final decision and remands a case for further administrative proceedings after the effective date of these final rules, we will apply these final rules to the entire period at issue in the decision we make after the court's remand."  *See* Social Security Administration's Revised Medical Criteria for Evaluating Mental Disorders, 81 FR 66138-01, *available at* 2016 WL 5341732 at *66138 and n.1.

[90] A.R. 50–58.

William Weiss testified as the vocational expert. Based on the ALJ's hypothetical, he opined that Ms. Larsen could perform her past work as a curriculum advisor.[91] He also testified that in the alternative, there were jobs that existed in the national or regional economy that Ms. Larsen could perform, including an appointment clerk and civil service clerk.[92]

*Ms. Larsen's Function Report*

Ms. Larsen completed a function report on June 25, 2015. She reported that she experienced a lack of concentration and memory; had problems with sleep; experienced increased malaise; and had depression or a "mood problem." She reported living alone in a townhouse; had no problems with self-care; and spent her days on "[l]ots of bed rest." She also indicated that it took her one hour to prepare meals and that she would "bake meat" and have "salad from restaurants." She reported that she could clean the house; do laundry; went outside daily; could shop in stores, by phone, and by computer; went to restaurants; read and watched television. Ms. Larsen reported being able to walk one to two miles before needing to stop and rest. She reported that she had changes in her concentration and memory and needed to be reminded to go places "about twice a week"

---

[91] The ALJ's hypothetical at the hearing was as follows:

> [L]et's assume that we have an individual the same age, education and work experience as that of Ms. Larsen who is limited in the following manner: This person is limited to light work. This person is never to climb any ladders, ropes or scaffolds. This person is limited to handling occasionally on the left. Fingering is limited to frequent. A.R. 76–77.

[92] A.R. 78–79.

and needed someone to accompany her "sometime[s]." She reported she had "no energy" and her conditions affected lifting, squatting, bending, standing, reaching, walking, stair climbing, memory, completing tasks, concentration, and understanding.[93]

## IV. DISCUSSION

Ms. Larsen is represented by counsel. In her opening brief, Ms. Larsen asserts the following errors: (1) the Appeals Council erroneously failed to consider the additional evidence Ms. Larsen put before the Council; (2) the ALJ failed to fully and fairly develop the record regarding Ms. Larsen's chronic fatigue syndrome; (3) the RFC is not supported by substantial evidence because it failed to take Ms. Larsen's chronic fatigue syndrome into account; and (4) the ALJ improperly discounted the opinion of examining expert Dr. Campbell and gave undue weight to Dr. Moore's testimony.[94] The Commissioner disputes Ms. Larsen's assertions.[95] The Court addresses each of Ms. Larsen's assertions in turn:

### A. Additional Evidence Submitted to Appeals Council

In the Appeals Council's notice denying review, the Council identified the additional medical evidence it had received from Ms. Larsen: the treating source statement from Allison Kelliher, M.D., dated October 3, 2017; Imaging Associates' record dated June 20, 2017; and the treating source statement from Doris Bergeron Counseling Services LLC dated October 2, 2017. But the Appeals Council determined this additional evidence did

---

[93] A.R. 250–57.

[94] Docket 13 at 2.

[95] Docket 14 at 2–10.

"not relate to the period at issue" and therefore did "not affect the decision about whether [Ms. Larsen] was disabled beginning on or before April 30, 2016, the approximate date of the ALJ's decision."[96]

Ms. Larsen argues that the Appeals Council "refused additional evidence that Ms. Larsen submitted to the Appeals Council even though she was required to do so by regulations." She asserts "this type of additional evidence submitted to the Appeals Council after an ALJ decision must be considered in the merits decision" and "[i]t cannot be a response to say that the additional evidence that Ms. Larsen submitted to the Appeals Council does not relate to the period at issue. That cannot be a basis because the regulatory change imposed on Ms. Larsen an 'ongoing' obligation to 'submit all evidence that relates to the disability claim.'"[97]

When the Appeals Council declines review, its decision is not subject to judicial review and "the ALJ's decision becomes the final decision of the Commissioner."[98]

_____

[96] A.R. 2. The ALJ decision is dated May 2, 2017. However, the ALJ did note that the "relevant period ended April 30, 2016." A.R. 38.

[97] Docket 13 at 9–13; A.R. 2, 5. The regulation cited by Ms. Larsen specifically states that a claimant's ongoing duty to inform the Social Security Administration about or submit evidence related to the disability claim "applies at each level of the administrative process, including the Appeals Council level *if [it] relates to the period* which is the subject of the most recent hearing decision." 80 Fed. Reg. at 14830, *available at* 2015 WL 1254424 (emphasis added); 20 C.F.R. § 404.1512. *See also* 20 C.F.R. § 404.970 (Effective January 17, 2017, the Appeals Council will review a case if, "additional evidence that is new, material, and relates to the period on or before the date of the hearing decision, and there is a reasonable probability that the additional evidence would change the outcome of the decision" and if the claimant has evidence required under § 404.1512 but missed the deadline for submission to the ALJ and shows "good cause for not informing us about or submitting the evidence.").

[98] *Taylor v. Comm'r of Soc. Sec. Admin.,* 659 F.3d 1228, 1231 (9th Cir. 2011); *see Klemm v. Astrue,* 543 F.3d 1139, 1144 (9th Cir. 2008) ("The Social Security Act grants to district courts jurisdiction

However, "when the Appeals Council considers new evidence in deciding whether to review a decision of the ALJ, that evidence becomes part of the administrative record, which the district court must consider when reviewing the Commissioner's final decision for substantial evidence."[99]  The district court considers the additional evidence, "which was rejected by the Appeals Council, to determine whether, in light of the record as a whole, the ALJ's decision was supported by substantial evidence and was free of legal error."[100]

In this case, the Appeals Council rejected the additional medical evidence submitted by Ms. Larsen in its review of the ALJ's decision.[101]  The Appeals Council determined that the evidence did not relate to the period at issue, but the submitted medical evidence is part of the administrative record and will be considered by this Court.[102]  The medical records submitted to and rejected by the Appeals Council included MRI evidence of a back impairment dated after the date of the ALJ's decision.[103]  There is some evidence of back problems in the treatment records in late 2014 to early 2015, but those appear to have resolved.  At a physical examination with Dr. Meinhardt on

---

to review only 'final decisions' of the Commissioner") (citing 42 U.S.C. § 405(g))).

[99] *Brewes v. Comm'r of Soc. Sec. Admin.,* 682 F.3d 1157, 1163 (9th Cir. 2012) (internal citation omitted).

[100] *Id.* at 1232.

[101] A.R. 2.

[102] S*upra* note 99.  *See also Taylor,* 659 F.3d at 1231.

[103] A.R. 17–18, 20.

October 21, 2015, Ms. Larsen reported a history of hip and back discomfort that was then resolved.[104]  Additionally, the evidence submitted to the Appeals Council included a letter from LCSW Bergeron, but only the first page of the letter is in the Court's record.[105] Finally, the additional evidence includes a letter from Dr. Kelliher dated October 3, 2017 describing the MRI evidence of Ms. Larsen's back and neck impairments from June 20, 2017, with the notation that "[Ms. Larsen] finds these pains quite debilitating and they certainly interrupt her quality of life and activities of daily living."  But, as  noted above, the letter refers to MRIs taken after the ALJ's decision.[106]

The 2017 MRIs and October 2017 letter from Dr. Kelliher do not relate to the period at issue.  And the one page of LCSW Bergeron's letter is consistent with her extensive treatment notes in the record. Accordingly, the additional post-hearing evidence does not alter the substantial evidence in the record for the period at issue that underlies the ALJ's decision.

B. Development of the Record

Ms. Larsen asserts that the ALJ failed to fully and fairly develop the record regarding Ms. Larsen's chronic fatigue syndrome.  Specifically, she asserts that the

---

[104] A.R. 745–48.

[105] The portion of the letter that was included in the record sets forth part of Ms. Larsen's psychological history and reported mental and physical issues as of October 2, 2017.  The included part of the letter does not include new information, includes no medical opinions, and was dated outside the relevant time period.  A.R. 23.

[106] A.R. 17–18, 20, 22.  In a letter from January 2017, Dr. Kelliher indicated that she had treated Ms. Larsen for "chronic low back pain."  However, there are no treatment notes from Dr. Kelliher in the Court's record.  A.R. 828.  *See also* 20 C.F.R. § 404.970.

agency failed to follow up with Dr. Meinhardt regarding Ms. Larsen's functional limitations.[107]   The Commissioner maintains that the duty to develop the record was satisfied.[108]

## 1. *Legal Standard*

The ALJ has an "independent duty to fully and fairly develop the record and to assure that the claimant's interests are considered."[109]   An "ALJ's duty to develop the record further is triggered only when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence."   Additionally, the "ALJ must be especially diligent when the claimant is unrepresented or has only a lay representative."[110]   If the evidence is insufficient to make a decision regarding disability or the ALJ cannot reach a conclusion based on the evidence before her, she may recontact a treating physician, psychologist, or other medical source; request additional existing records; or ask for more information from the claimant or others.[111]

## 2. *Analysis*

Ms. Larsen alleges that the ALJ failed to fully and fairly develop the record

---

[107] Docket 13 at 2, 15–16.  *See also* A.R. 748.

[108] Docket 14 at 6–7.

[109] *Tonapetyan v. Halter,* 242 F.3d 1144, 1150 (9th Cir. 2001).

[110] *McLeod v. Astrue,* 640 F.3d 881, 885 (9th Cir. 2011).

[111] *Smolen v. Chater,* 80 F.3d 1273, 1288 (9th Cir. 1996) ("If the ALJ thought he needed to know the basis of [a doctor's] opinions in order to evaluate them, he had a duty to conduct an appropriate inquiry, for example, by subpoenaing the physicians or submitting further questions to them."); *see also* 20 C.F.R. §§ 404.1520b, 416.920b (effective until March 27, 2017).

regarding her chronic fatigue syndrome. Pursuant to Social Security Ruling 14-1p, she alleges the ALJ should have followed up on Dr. Meinhardt's statement in his evaluation that Ms. Larsen "apparently has chronic fatigue syndrome." She also alleges the ALJ should have asked Dr. Meinhardt for functional limitations.[112]

Under Social Security Ruling, SSR 14-1p, a claimant "can establish that he or she has a [medically determinable impairment] of [chronic fatigue syndrome] by providing appropriate evidence from an acceptable medical source. A licensed physician (a medical or osteopathic doctor) is the only acceptable medical source who can provide such evidence. We cannot rely upon the physician's diagnosis alone. The evidence must document that the physician reviewed the person's medical history and conducted a physical exam."[113] Further, in cases in which chronic fatigue syndrome is alleged, the ALJ generally needs longitudinal clinical records reflecting ongoing medical evaluation and treatment from the person's medical sources. When there is insufficient evidence to determine whether a claimant has a medically determinable impairment of chronic fatigue syndrome or is disabled, the ALJ may recontact a treating or other source, request additional existing records, ask for more information, or obtain a consultative examination.[114]

---

[112] Docket 13 at 2, 15–20. *See also* A.R. 748.

[113] The full title of the ruling is "Social Security Ruling, SSR 14-1p; Titles II and XVI: Evaluating Claims Involving Chronic Fatigue Syndrome (CFS)."

[114] SSR 14-1p, *available at* 2014 WL 1371245 at * 4–7. "Social Security Rulings [ ] do not carry the 'force of law,' but they are binding on ALJs nonetheless. They reflect the official interpretation of the [Social Security Administration] and are entitled to some deference as long

Here, ALJ LaCara found that Ms. Larsen's chronic fatigue syndrome was a severe impairment at Step 2. She noted that Dr. Meinhardt diagnosed Ms. Larsen with chronic fatigue syndrome at a consultative evaluation.[115] He had reviewed Ms. Larsen's records and did a physical examination pursuant to SSR 14-1p. In his evaluation, Dr. Meinhardt outlined Ms. Larsen's medical history of "[a]drenal fatigue/chronic fatigue with insomnia." He noted that at the time of the visit, Ms. Larsen reported her insomnia was pretty much resolved and under control. However, in his conclusion, Dr. Meinhardt stated, "[t]his quiet but pleasant lady apparently has chronic fatigue syndrome."[116] Beyond a diagnosis of apparent chronic fatigue syndrome, Dr. Meinhardt provides no further explanation. Dr. Meinhardt's evaluation of Ms. Larsen's insomnia is in tension with his diagnosis that she has apparent chronic fatigue syndrome.[117]

The ALJ also considered Dr. Kelliher's opinion that Ms. Larsen's ability to work was limited in part by "extreme fatigue," but correctly pointed out that the opinion was "not accompanied with any treatment notes to substantiate the existence of this condition."[118] In her January 2017 letter, Dr. Kelliher indicated that she was Ms. Larsen's primary care

---

as they are consistent with the Social Security Act and regulations." *Molina v. Astrue*, 674 F.3d 1104, 1113 n.5 (9th Cir. 2012) (internal quotation marks and citation omitted).

[115] A.R. 30.

[116] A.R. 745–48. *See supra* note 115.

[117] *Thomas v. Barnhart,* 278 F.3d 947, 957 (9th Cir. 2002) ("The ALJ need not accept the opinion of any physician, including a treating physician, if that opinion is brief, conclusory, and inadequately supported by clinical findings.") (internal citation omitted).

[118] A.R. 30.

provider and that Ms. Larsen had established care with her in September of 2016,[119] but did not specifically note that she had conducted a medical review or physical examination pursuant to SSR 14-1p, nor did Dr. Kelliher specifically diagnose Ms. Larsen with chronic fatigue syndrome in the letter.[120]   Additionally, the treatment record reflects that Ms. Larsen believed her insomnia resulted from her glaucoma medications and that her sleep problems were resolving after she stopped taking that medication in early 2013.[121]   For example, Ms. Larsen reported to psychiatrist Dr. Yanagida in March 2013 and again to PAC Scott in April 2013 that her glaucoma medication was causing her insomnia.[122]   At other visits, she reported improved sleep.[123]   At a visit to Providence Medical Center in September 2014, Dr. Baker informed Ms. Larsen that she "did not think that [Ms. Larsen] was disabled from insomnia" and did not think Ms. Larsen "warranted Social Security disability for this."[124]   There is no evidence in the record that Ms. Larsen underwent testing

---

[119] The October 3, 2017 letter stated that Ms. Larsen was "well known to our clinic and has been seen since September of 2016."  A.R. 22.

[120] A.R. 30, 22, 828.  Dr. Kelliher noted that Ms. Larsen was seen at Vitae medical center for "[m]ajor depression, generalized anxiety, chronic pain syndrome, fibromyalgia, chronic low back pain, osteoarthritis, menopausal syndrome, impaired cognition, memory impairment, and insomnia."  In her letter of January 2017, Dr. Kelliher specifically states, "Unfortunately [Ms. Larsen's] extreme fatigue, impaired concentration and polyarthralgias limit her ability to work."  A.R. 828.  In her letter of October 3, 2017, Dr. Kelliher states that Ms. Larsen "often finds herself lying down in the middle of the day due to fatigue from pain."  A.R. 22.

[121] A.R. 432.

[122] A.R. 288, 432–33.

[123] *e.g.,* A.R. 466, 459–60, 637–39.

[124] A.R. 751.

or examination to rule out other causes for her fatigue.[125]

The ALJ also noted that Ms. Larsen's chronic fatigue syndrome diagnosis was "somewhat unsupported as demonstrated by her reported activities."[126]  Although Ms. Larsen testified that she had sleep difficulties and fatigue, she testified that she travelled to Texas, could do paperwork, drive to yoga classes, do housework, read, grocery shop, walk with friends, and work on the computer.[127]  She also indicated that she could not go back to doing a clerical job full-time because it would be "hard for [her] . . . to sit."[128]  Throughout the record, Ms. Larsen reported engaging in social activities regularly including dating and having romantic relationships, socializing with friends, traveling, dancing, running and walking, and participating in yoga classes.  She managed the sale of a house and probate.[129]  Further, the ALJ gave great weight to testifying psychiatrist Dr. Moore's opinion that Ms. Larsen's insomnia was not a psychological impairment and had basically been resolved after stopping her glaucoma medications.[130]

The evidence before the ALJ was sufficient to make a decision regarding Ms.

---

[125] *Reddick v. Chater,* 157 F.3d 715, 723–24 (9th Cir. 1998); *see also* SSR 14-1p, *available at* 2014 WL 1371245 at * 2.

[126] A.R. 34, 58–71, 250–57.  *See Molina v. Astrue,* 674 F.3d 1104, 1112 (9th Cir. 2012) (The ALJ "may consider inconsistencies either in the claimant's testimony or between the testimony and the claimant's conduct.").

[127] A.R. 58–65.

[128] A.R. 68.

[129] *e.g.,* A.R. 58–71, 250–57, 412–17, 432, 439, 459–60, 524.

[130] A.R. 35–36, 54.

Larsen's chronic fatigue syndrome. There is substantial evidence in the record to support the ALJ's determinations regarding the functional impact of MS. Larsen's chronic fatigue syndrome. The ALJ was not required to seek additional testimony or another evaluation from Dr. Meinhardt regarding Ms. Larsen's functional limitations. For the foregoing reasons, the ALJ developed the record adequately with respect to Ms. Larsen's chronic fatigue syndrome.

C. Medical Opinions

Ms. Larsen asserts that the ALJ did not give specific and legitimate reasons for discounting evaluating psychologist Dr. Campbell's opinion regarding Ms. Larsen's psychological limitations. Specifically, she asserts that it was error to give more weight to Dr. Moore's opinion because Dr. Moore's testimony "depended wholly on the report and data of psychiatrist Dr. Campbell."[131] The Commissioner counters that the ALJ "reasonably resolved the conflicting medical evidence."[132]

1. *Legal Standard*

"Regardless of its source, [the SSA] will evaluate every medical opinion [it] receive[s]."[133] Medical opinions come from three types of sources: those who treat the claimant; those who examine but do not treat the claimant; and those who neither

---

[131] Docket 13 at 21–24.

[132] Docket 14 at 7.

[133] 20 C.F.R. § 404.1527(c). This section applies to claims filed before March 27, 2017.

examine nor treat the claimant. "As a general rule, more weight should be given to the opinion of a treating source than to the opinion of doctors who do not treat the claimant."[134] In the Ninth Circuit, "[t]o reject the uncontradicted opinion of a treating or examining doctor, an ALJ must state clear and convincing reasons that are supported by substantial evidence."[135] When "a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons supported by substantial evidence."[136] This can be done by "setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating [her] interpretation thereof, and making findings."[137]

Factors relevant to evaluating any medical opinion include: (1) the examining or treatment relationship; (2) the consistency of the medical opinion with the record as a whole; (3) the physician's area of specialization; (4) the supportability of the physician's opinion through relevant evidence; and (5) other relevant factors, such as the physician's degree of familiarity with the SSA's disability process and with other information in the record.[138] An ALJ may reject the opinion of a doctor "if that opinion is brief, conclusory,

---

[134] *Garrison v. Colvin*, 759 F.3d 995, 1012 (9th Cir. 2014) (quoting *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995)).

[135] *Trevizo v. Berryhill*, 871 F.3d 664, 675 (9th Cir. 2017) (quoting *Bayliss v. Barnhart,* 427 F.3d 1211, 1216 (9th Cir. 2005)).

[136] *Revels v. Berryhill,* 874 F.3d 648, 654 (9th Cir. 2017).

[137] *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998) (citing *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989)).

[138] 20 C.F.R. §§ 404.1513a(b), 404.1527(c)(2). These sections apply to claims filed before March 27, 2017. *See* 20 C.F.R. § 404.614.

and inadequately supported by clinical findings."[139]

The opinions of agency physician consultants may be considered medical opinions, and their findings and evidence are treated similarly to the medical opinion of any other source.[140] "The weight afforded a non-examining physician's testimony depends 'on the degree to which [she] provides supporting explanations for [her] opinions.'"[141] Greater weight may also be given to the opinion of a non-examining expert who testifies at a hearing because she is subject to cross examination.[142] The opinions of non-treating or non-examining physicians may serve as substantial evidence when the opinions are consistent with independent clinical findings or other evidence in the record.[143]

2. *Analysis*

Here, evaluating psychologist Dr. Campbell assessed Ms. Larsen with cognitive deficits and dependent personality disorder. In his report, Dr. Campbell noted that Ms. Larsen, "had to be coaxed to give maximum effort." However, Dr. Campbell provided no function limitations, but noted that Ms. Larsen had found psychotherapy "to be quite

---

[139] *Bayliss,* 427 F.3d at 1216.

[140] 20 C.F.R. §§ 404.1513a(b).

[141] *Garrison,* 759 F.3d at 1012 (quoting *Lester,* 81 F.3d at 830).

[142] *Andrews v. Shalala,* 53 F.3d 1035, 1042 (*citing Torres v. Secretary of H.H.S.,* 870 F.2d 742, 744 (1st Cir. 1989)).

[143] *Thomas v. Barnhart,* 278 F.3d 947, 957 (9th Cir. 2002).

helpful in examining her dependency needs and in grieving her late husband."[144]  Dr. Campbell's diagnoses were contradicted by medical expert Dr. Moore's conclusion that Ms. Larsen's mental health conditions were not severe and she did not suffer from debilitating cognitive deficits or a personality disorder.[145]  Therefore, the ALJ was required to provide specific and legitimate reasons supported by substantial evidence for discounting Dr. Campbell's diagnostic opinion.[146]

The ALJ discussed Dr. Campbell's one-time evaluation of Ms. Larsen.  ALJ LaCara concluded that Dr. Campbell's prognosis of Ms. Larsen was consistent with and supported by the longitudinal record and Dr. Moore's opinion, but discounted Dr. Campbell's diagnostic opinions as inconsistent and unsupported.[147]  The RFC did not include any mental health limitations.[148]  At the same time, ALJ LaCara gave "great weight" to testifying, non-examining medical expert Dr. Moore's opinions and provided the following reasons for so doing:  (1) they were "consistent with and supported by the longitudinal record" and (2) Dr. Moore was an expert in the field of psychological disability evaluation and had "the opportunity to review all of the psychological treatment notes in the record prior to offering her opinions."[149]

---

[144] A.R. 738.

[145] A.R. 55–56.

[146] *Revels,* 874 F.3d at 654.

[147] A.R. 36, 735–38.

[148] A.R. 33.

[149] A.R. 35–36.

At the hearing on January 13, 2017, Dr. Moore opined that Dr. Campbell's cognitive deficit diagnosis didn't make "a lot of sense, especially in light of the rest of the record, which really does not suggest any kind of compelling cognitive problem."[150] Dr. Moore noted that situational issues in Ms. Larsen's life, including the two-year anniversary of her husband's death, the sale of her home, and family conflicts explained Ms. Larsen's adjustment disorder, bereavement, and depression. She discussed the resolution of Ms. Larsen's insomnia. Dr. Moore also opined that the dependent personality disorder diagnosis "was probably suggested because of [Ms. Larsen]'s reporting about her history in her marriage, and I'm not even convinced that it's a reasonable diagnosis." Dr. Moore added that, "from my point of view, a clinical point of view, this woman seems to be quite actively engaged in the world, functioning really quite well." Dr. Moore concluded that Ms. Larsen had no functional limitations in a work setting that would be caused by her mental impairments.[151] In this case, Dr. Moore's opinions, together with the other evidence in the record, constituted substantial evidence justifying the rejection of Dr. Campbell's diagnostic opinions.[152]

---

[150] A.R. 53.

[151] A.R. 52–57. *See Andrews,* 53 F.3d at 1042 ("greater weight may be given to opinion of nonexamining expert who testifies at hearing subject to cross-examination").

[152] *See Lester v. Chater,* 81 F.3d 821, 831 (9th Cir. 1995) (The "opinion of a nonexamining physician cannot by itself constitute substantial evidence that justifies the rejection of the opinion of either an examining *or a* treating physician."); *see also Thomas v. Barnhart,* 278 F.3d 947, 957 (9th Cir. 2002) (the "opinions of non-treating or non-examining physicians may also serve as substantial evidence when the opinions are consistent with independent clinical findings or other evidence in the record.").

For the foregoing reasons, the Court finds that the ALJ provided specific and legitimate reasons supported by substantial evidence for discounting Dr. Campbell's diagnostic opinions and giving great weight to testifying psychological expert Dr. Moore's conflicting opinions.

D. Ms. Larsen's RFC

Ms. Larsen alleges that the RFC failed "to take account of the vocationally significant limitations of chronic fatigue syndrome."[153]  Specifically, she asserts that the ALJ failed to properly analyze Ms. Larsen's chronic fatigue syndrome under SSR 14-1p and "failed to assess Dr. Kelliher's medical source statement."[154]

1. *Legal Standard*

The RFC is an individual's "maximum remaining ability to do sustained work-related physical and mental activities in an ordinary work setting on a regular and continuing basis," and "must include a discussion of the individual's abilities on that basis."[155]  A court should affirm an ALJ's determination of a claimant's RFC "if the ALJ applied the proper legal standard and [her] decision is supported by substantial evidence."[156]  An ALJ "may rely on a vocational expert's testimony that is based on a hypothetical that 'contains all of the limitations that the ALJ found credible and supported

---

[153] Docket 13 at 17.

[154] Docket 13 at 17–21.

[155] SSR 96-8p, *available at* 1996 WL 374184 at *2.

[156] *Bayliss,* 427 F.3d at 1217 (citing *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 599 (9th Cir. 1999)).

by substantial evidence in the record.'"[157]  It is "proper for an ALJ to limit a hypothetical to those impairments that are supported by substantial evidence in the record."[158]  However, an ALJ must consider "limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'"[159]

2. *Analysis*

Here, the ALJ found that Ms. Larsen had severe impairments of very mild to minimal degenerative changes of the right ankle, mild to moderate degenerative changes at the left thumb, moderate degenerative changes at the right great toe, and apparent chronic fatigue syndrome.[160]  Based thereon, ALJ LaCara concluded that Ms. Larsen could perform light work with certain exceptions.[161]  ALJ LaCara relied on the testimony of the vocational expert to determine that a person with Ms. Larsen's current residual functional capacity could perform her past work as a curriculum advisor and could also perform the requirements of occupations such as an appointment clerk or civil service clerk.[162]

As set forth above, the ALJ's reasons for discounting Dr. Campbell's opinions

---

[157] *Ghanim,* 763 F.3d at 1166 (quoting *Bayliss,* 427 F.3d at 1217).

[158] *Osenbrock v. Apfel,* 240 F.3d 1157, 1165 (9th Cir. 2001) (citing *Magallanes v. Bowen,* 881 F.2d 747, 756-57 (9th Cir. 1989)).

[159] 20 C.F.R. §§ 404.1545(a)(2), 416.945(a)(2); *see also* SSR 96-8p, *available at* 1996 WL 374184 at *5.

[160] A.R. 30.

[161] A.R. 33.

[162] A.R. 38, 71–82.

regarding Ms. Larsen's mental limitations were specific and legitimate. And, the ALJ's decision not to include mental health limitations in the RFC was supported by substantial evidence. The ALJ also fully and fairly developed the record regarding Ms. Larsen's chronic fatigue syndrome. She addressed Dr. Kelliher's letter of January 2017.[163] ALJ LaCara was not required to follow up with Dr. Meinhardt in this case. The additional MRI results and letters from Dr. Kelliher and LCSW Bergeron supported the ALJ's conclusion that Ms. Larsen's "level of functioning [was] not as fully limiting as alleged."[164]

For the foregoing reasons, Ms. Larsen's medically determinable limitations were adequately accounted for in the RFC and supported by substantial evidence.

## V. ORDER

The Court, having carefully reviewed the administrative record, finds that the ALJ's determinations are free from legal error. Accordingly, IT IS ORDERED that Ms. Larsen's request for relief at Docket 13 is DENIED, the Commissioner's final decision is AFFIRMED. The Clerk of Court is directed to enter a final judgment accordingly.

DATED this 7th day of October 2019 at Anchorage, Alaska.

*/s/ Sharon L. Gleason*
UNITED STATES DISTRICT JUDGE

---

[163] In her decision, ALJ LaCara noted that "[i]n a post hearing letter dated the same day as the hearing from the claimant's brand new physician, CFS is alleged; however, this letter is not accompanied with any treatment notes to substantiate the existence of this condition." A.R. 22, 30.

[164] A.R. 34. *See Bayliss,* 427 F.3d at 1217.